IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Nikia Thomas, | ) | C/A No. 4:21-cv-2301-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| American Security Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation ("Report and Recommendation" or "Report") of United States Magistrate Judge Kaymani D. West, made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] (DE 49.) Plaintiff Nikia Thomas ("Plaintiff" or "Thomas") filed this action alleging (1) discrimination on the basis of race and (2) retaliation in the terms, conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII") against Defendant American Security Insurance Company ("Defendant," "AISC," or "Assurant"). (DE 1.)

On May 16, 2023, Defendant filed a Motion for Summary Judgment asserting, among other things, that 1) Plaintiff's 2020 EEOC disparate treatment charge does not allege facts to support a hostile work environment claim under Title VII, 2) Plaintiff cannot prove Defendant's conduct resulted in a tangible employment action and Defendant has met its burden of demonstrating it

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

exercised reasonable care to prevent and correct the behavior complained of, and 3) Plaintiff cannot establish the severe or pervasive requirement. (DE 38-1.) Plaintiff filed a response (DE 40, 41), and Defendant filed a Reply (DE 42). On December 19, 2022, the Magistrate Judge issued the Report, recommending this Court grant Defendant's Motion for Summary Judgment, (DE 49.) Accordingly, for the reasons stated below, the Court adopts the Report and grants Defendant's Motion for Summary Judgment, as provided herein.

## BACKGROUND

The Report and Recommendation sets forth the relevant facts and legal standards, which the Court incorporates herein without a complete recitation. However, as a brief background relating to the objections raised by Plaintiff, the Court provides this summary.

### A. Plaintiff's employment by Defendant

Plaintiff began working for Assurant in 2004. (DE 38-2, p. 7.) Plaintiff works from home and has been working virtually since approximately 2012. (DE 38-2, p. 7, 24:16-20.) According to Defendant, Plaintiff began working on manager Brandi Howard's team (sometimes referred to as "Team Howard") around January 2019. (DE 38-1.) Howard encouraged Plaintiff to apply for the position of senior quality control specialist and promoted her to that position from that of quality control ("QC") specialist. (DE 38-5, pp. 6-7.)

### B. Plaintiff's 2019 EEOC Charge and surrounding events

On November 22, 2019, Plaintiff submitted a Charge of Discrimination against Defendant to the Equal Employment Opportunity Commission ("EEOC") and South Carolina Human Affairs Commission ("SCHAC") alleging discrimination on July 29, 2019, "at the earliest" and August 8, 2019, "at the latest" ("2019 Charge"). (DE 38-3, p. 9.) The "continuing violation" box was not

checked. In checking the "retaliation" box on the Charge form, Plaintiff provided the following "particulars" of her claim:

> I began my employment with Assurant Specialty Property May 24, 2004 and was later promoted to senior quality control specialist. I have always received satisfactory performance evaluations and never have been written up or received any disciplinary action. On or around July 25, 2019, I was spoken to in a disrespectful manner by Brandi Howard, quality control manager, white, due to me questioning being required to attend a training that I already did and the training being unpaid. I reported this to treatment to Brian Kovach, quality control operations manager, white, David Susag, director of quality control, white, and Christine Bieller, HR Associate, White.
>
> July 25, 2019, I spoke with Brian Kovach regarding this issue and then I reached out to Christine Bieller to advise what was going on between me and Brandi. July 26, 2019, I spoke with Brandi and she was aware that I had reached out to HR and she was upset. I reported to Brian that she knew and was upset that I went to HR regarding this situation. August 8, 2019, I met with Brian, and advised him that I was been [sic] bullied, intimidated, pressured, harassed, and retaliated against by my manager following the incident that occurred on July 25th, resulting in my manager telling me to clock out. I advised him of the retaliation that took place since the last time him [sic] and I spoke on July 29, 2019, when Brandi falsely accused me [of] not attending the training.
>
> I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, due to retaliation.

(DE 38-3, pp. 9-10.) Plaintiff acknowledged that in the discussions with Brian Kovach ("Kovach") and Christine Bieller ("Bieller") referenced in the 2019 Charge, she had made no reference to race. (DE 38-2, p. 88.)

In addition, Plaintiff had a telephone call with Howard on Thursday, July 25, 2019, about attending training on the following Saturday. Plaintiff indicates Howard advised her she would not be paid for the Saturday training because she could not receive overtime pay. Plaintiff indicates she asked Howard whether she needed to attend the training because it seemed it may be duplicative of training she had already received. Plaintiff says that once Howard advised her it

3

was training that Plaintiff needed to attend "through the lens of a senior associate," Plaintiff was "fine with that." (DE 38-2, pp. 65-70.)

In Plaintiff's deposition, she indicated Howard initially had told her that she could not receive overtime pay for attending the training, so she would not be paid for the Saturday training. (DE 38-2, pp. 70-71.) When Plaintiff advised Howard that her expectation was that she would be paid when she came into work, Howard asked her what was "going on" with her and indicated she believed Plaintiff had something "going on" that she did not want to tell Howard about. (DE 38-2, p. 71.) Howard again asked Plaintiff if she was saying she did not want to attend the training. Howard got "very loud" and was "yelling and screaming" at Plaintiff. (DE 38-2, p. 72.) Plaintiff suggested ending the call; however, Howard did not end it until Howard decided it was time to end it. (DE 38-2, pp. 72-73.) Howard advised Plaintiff that she needed to clock out for the day because there was "something going on" with her. Id. Plaintiff inquired as to whether she would be paid if she stopped working for the day; Howard advised that she did not know but would figure it out tomorrow. Id. Before clocking out, Plaintiff sent messages to Kovach and to Bieller in HR regarding whether she would be paid. (DE 38-2, pp. 73-74.) Bieller got back with Plaintiff and advised that she would be paid if she clocked out for the day. Plaintiff said she was paid for that day. Id. Plaintiff indicates she did end up receiving payment for attending the training at issue. She says she was advised by Kovach that she should leave early on the Friday before the Saturday training so that she would be paid on Saturday but not be in an overtime situation. (DE 38-2, pp. 65-67, 75.)

In a Dismissal and Notice of Suit dated January 28, 2020, the EEOC dismissed Plaintiff's 2019 Charge, finding that "the facts alleged in the charge failed to state a claim under any of the statutes enforced by the EEOC." (DE 38-3, p. 13.) Plaintiff did not file a lawsuit after receiving

the notice of right to sue for the 2019 Charge in January 2020. (DE 38-2, p. 104.) Plaintiff's time for filing suit on that charge has expired.

### C. Plaintiff's August 2019 meeting and follow up

The record includes an email from Plaintiff to Director David Susag ("Susag") that she sent on August 28, 2019, in follow-up to a meeting she had with him on August 23, 2019. (DE 38-3, pp. 39-47, DE 41-2, p. 10-11.) In the email, Plaintiff notes that during the August 23, 2019, meeting she had advised Susag of the "retaliation complaint that was initiated on July 25, 2019, as well as an incident in which [Howard] yelled, demeaned, bullied, and disrespected [her] in front of the team as well as [Kovach], and it was not resolved." (DE 38-3, p. 40). The August 28, 2019, email contained a long list of Plaintiff's "to-do" items from various days. Id. Plaintiff also included a printed version of a Skype IM session, which appears to be an example of Howard's "management style, bullying, demanding, intimidating, retaliatory tactics [that are] too much." Id. Plaintiff notes she needs to "move forward" and that she was not demoted and did not lose her job. She ends by noting she "cannot work in a hostile work environment that has been created by [her] manager, as well as causing disharmony to the team, and the extra weight and stress that this is causing me." Id. She says she "can no longer deal with the pressure of being forced to work under [Howard]." Id.

Susag responded to Plaintiff's email to thank her for the update. Id. at 39. Later that day Susag forwarded the email to Kovach and Bieller. (DE 41-2, p. 10.) Susag indicated Plaintiff's commentary was "a little tough to translate," but "appear[s] to display an employee that is challenging the direction she is receiving from her manager or at least not making it easy." Id. see also DE 38-2, p. 188 (characterizing the email as detailing the things she was to be doing and the messages she was receiving from team and how her work was changing).

**D. Plaintiff's 2020 EEOC Charge and surrounding events**

Plaintiff filed a second EEOC charge on March 19, 2020 (the "2020 Charge"). (DE 38-3, 14-16.) Plaintiff checked the "race" box on the Charge form, indicating the Charge concerned race-based discrimination. The 2020 Charge indicated the discrimination took place on November 13, 2019, at the "earliest" and at the "latest." (Id.)The "continuing action" box was not checked. Plaintiff included the following "particulars" in the 2020 Charge:

> I filed a charge of discrimination against the above named employer on November 22, 2019. Since that time my duties have increased substantially and I have been assigned tasks inconsistent with my job description. To my knowledge, I am the only employee assigned these additional tasks.
>
> According to my employer[']s management these assignments are workflow development however; I believe this is pretext, as a White co-worker with the same position, has not been assigned additional duties[.]
>
> I believe I have been discriminated against based []on my race (Black) and retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act, as amended.

(DE 38-3, p. 14.)

In her deposition, Plaintiff indicated the white coworker she referenced was Brett Tonkin ("Tonkin'). (DE 38-2, p. 38, 147:19-21.). Plaintiff indicated she had been "given extra job duties that [were] not part of [her] job function." (DE 38-2, p. 40.)

The record also includes a January 30, 2020, email from Plaintiff to EEOC investigator Andrew Davis with the subject line "Increased Work" in which Plaintiff outlined her "reasoning for filing the complaint." (DE 38-3, pp. 24-25.) The email indicates she is filing the claim "for discriminatory practices and increasing [her] work functions based on the complaint filed." Id. Plaintiff recounts having received emails beginning December 6, 2019, that assigned her extra duties that had not been assigned to Tonkin, who is also a Senior. Id. Plaintiff indicated the emails forced her to "change/adjust [her] work schedule" to an earlier time to oversee a function called "open items." Id. Plaintiff indicates her pay was not increased. Id. Plaintiff says the "emails have

increased" since she filed the complaint, and she felt her "job was in jeopardy." Id. Plaintiff indicates she had just been advised that all of her job duties were changing, and she felt she was being "set up to fail." Id.

The EEOC, through Senior Investigator Davis, wrote Plaintiff on October 7, 2020, and advised her the EEOC had reviewed the matter in which she alleged she was subject to "unlawful discrimination, because of [her] race and in retaliation for a previous complaint of discrimination[,]" and was dismissing her Charge and issuing her a right to sue letter. (DE 38-3, p. 31.)  The letter provided in relevant part,

> The evidence obtained by the Commission is insufficient to show a nexus between your previous complaint of discrimination and your assignment of additional job duties. The evidence is also insufficient to show any employee (regardless of race), was treated more favorably, or not assigned collateral duties, based on race. Finally, no evidence suggests you were subjected to any adverse employment action, after you filed a charge of discrimination.

Id.  The EEOC issued Plaintiff's right-to-sue letter on April 27, 2021. (DE 38-3, p. 21.)

**E. Plaintiff's June 2020 complaints and Defendant's following investigation**

In June 2020, Plaintiff sent a formal written complaint to Defendant's executives because she wanted to "make them aware of what was going on." (DE 38-2, pp. 189-90.)  Plaintiff indicated she did not endeavor to include all of her concerns of discrimination and retaliation in that complaint because she felt they would also get information from HR and others. (DE 38-2, p. 190.)  Plaintiff's complaint was addressed to Garrett Hale ("Hale") and Alan Colberg ("Colberg"), and it stated she was "reaching out after exhausting all hopes of resolving an ongoing problem." (DE 38-3, p. 59.) Plaintiff indicated she had never had disciplinary issues in her prior 16 years with the company, but the past year had been her "most challenging, difficult, and the most stressful." Id.  Plaintiff indicated she had been "ridiculed, disrespected, harassed, and retaliated against" during her time working for Howard. Id.  Plaintiff expressed concern that she was known

7

as a troublemaker and an employee who runs to HR. She indicates she had been "advised that [she] shouldn't want to come across as the Black angry disgruntle[d] woman." Id.[2] Plaintiff set out various complaints about her work assignments and her work schedule, indicating she had tried to resolve the issues with Howard to no avail. (DE 38-3, pp. 59-60.) Plaintiff closed her letter complaint by stating, "I feel as a Black woman that my complaints have [fallen] on deaf ears with upper management as well as Human Resources." Id. at 60.

Thereafter, Plaintiff learned that the June 11, 2020, complaint was going to be investigated by the then-VP of Employee Relations, Georgie Cummins ("Cummins"); she heard from Cummins within that same week. (DE 38-2, pp. 191-92.) Plaintiff said she met with Cummins four or five

---

[2] Although not specifically mentioned in her formal complaint to Hale and Colberg, Plaintiff testified that on three different occasions, Howard made reference to race or racial comments from approximately November 2019 to March 2020. Plaintiff claims she was on a call with Howard in November 2019, and Howard allegedly said, "I like my coffee – first she said, I like my coffee dark. And then she said, no, I like my coffee, like, black, like peat, and stopped. And then she said, oh, let me stop, I can't say black jokes or things about black people, Nikia is on the phone, ha, ha, ha, and tried to laugh it off." (DE 38-2, p. 28.) Next, Plaintiff alleges in March 2020, that,

> We were on a phone call one day and we were talking about different celebrities, different celebrities that we have -- have I ever met anyone famous. And so she said that she stays in Ohio. She remembers a time when Jaleel White, which is Steve Urkel was in town. And she said that she didn't know why he was in town and she said, but more than likely, it was probably because Dave Chappelle had a show in town. I mean, that's the only reason why I can think that he would be there because Ohio is full of white people. So I wouldn't know why he would be there, considering the fact that he is black, [and Howard continued,] I encounter a lot of black people, a lot of famous black people, especially athletes, some in the entertainment business. But it's so hard to tell you all apart because all you black people look alike.

(DE 38-2, p. 28.) Plaintiff testified that she "got quiet" after these comments, and Howard said, "Nikia, are you still there, are you still there? She was like, it's a joke, it's a joke." (Id.) Lastly, Plaintiff alleges that during a conversation in which she and Howard disagreed about whether Plaintiff should handle certain job responsibilities, Howard said,

> Nikia, you come from a strong background. You have a very impressive background, she said, but I want to warn you that you are coming across as a strong, black, angry, disgruntled woman, and I want to remind you that that's not going to come across as – that's not going to come across that good and that you need to be mindful of the things that you say and do and how you are quick to act and respond to things.

(DE 38-2, p. 31.)

times. (DE 39-2, p. 192.) Cummins interviewed Plaintiff and 13 other employees as part of her investigation, which also included review of emails and materials Plaintiff provided, her 2019 performance review, and her job description. (DE 38-8, ¶ 6.) Cummins concluded that Howard had "not subjected Thomas to harassment, discrimination, or retaliation in violation of Assurant policies." Id. at ¶ 7. Cummins determined, though, that "Howard and Thomas did have a contentious relationship where some of their interactions with each other could be construed as disrespectful." Id. To address the relationship between Plaintiff and Howard, Cummins asked that Yolanda Hill, then an HR Partner, act as a facilitator by meeting separately with Plaintiff and Howard to discuss expectations and rules of engagement for working together and then to facilitate conversations between Plaintiff and Howard to address these issues. Id. at ¶ 8. Cummins also recommended coaching for Howard on effective management skills and conducted multiple sessions with Howard on that subject after her investigation. Id. Plaintiff was out on leave in July and August of 2020; Cummins met with Plaintiff on September 1, 2020, to discuss the investigation's findings and next steps. Cummins also asked Plaintiff what she was seeking in terms of resolution. Id. at ¶ 9.

Later, on September 1, 2020, Plaintiff emailed a response to Cummins. (DE 38-8, pp. 59-60.) Plaintiff reiterated some of her complaints and the response she had received and detailed her requested "actions needed to move forward[,]" including being "made whole by being compensated for the stress [she has] endured." Id. at 49. On September 30, 2020, Cummins and HR Director Donna Jones again met with Plaintiff to respond to Plaintiff's requested action. (DE 38-8, ¶ 9; DE 38-2, p. 212; DE 38-8, pp. 62-66.) Plaintiff indicated that she believed she was "kind of going around in circles," meeting with various people. (DE 38-2, pp. 212-213.) Cummins and Jones denied Plaintiff's request that her complaint be resolved with "compensation," advising

9

her they did not find anything that had been done wrong. (DE 38-8, ¶ 9; DE 38-2 pp. 213-214.) Cummins and Jones advised Plaintiff that they wanted to have Yolanda Hill work to facilitate the relationship between Plaintiff and Howard. (DE 38-8, ¶ 9; DE 38-2, p. 214.) Cummins noted that Plaintiff indicated she did not believe the plan could work, she did not want to work with Howard, and she did not have faith in HR; however, Plaintiff advised Cummins and Jones that she was not resigning from her position. (DE 38-8, ¶ 9; DE 38-2, pp. 214-217.)

On October 1, 2020, Plaintiff sent a "final follow up" email to various executives of Defendant, repeating her previous concerns and noting her dissatisfaction with the facilitation plan and with having to continue working with Howard. (DE 38-8, ¶ 10; DE 38-8, pp. 68-70.) The letter included Plaintiff's claims that Howard "has no sense of what it is like to be a Black woman in the workforce, and to make sarcastic jokes are very racist[,]" and that Howard had recently started referencing [Plaintiff] as 'HEY YOU.'" Plaintiff characterized the "HEY YOU" phrase as having "racial undertone," particularly "right now with all of the Black Lives Matter" activity. Id. at 69. Plaintiff also indicated Howard had treated an unnamed employee the same way within the past week. Id.[3] Plaintiff concluded that email with what she termed her "final requests." (DE 38-8, p. 70.) Plaintiff indicated she was not seeking "mediation," but was "seeking compensation/severance of over a year and a half of pain and suffering." Id.

In a November 19, 2020, follow-up meeting of Plaintiff, Jones, and Kovach's supervisor, Merrifield, Jones advised Cummins that Plaintiff had missed meetings with both Hill and Jones. (DE 38-8, ¶ 11; DE 38-8, pp. 75-77.) Plaintiff indicated she had postponed or rescheduled some meetings and indicates she had never agreed to meet with Hill and Howard. (DE 38-2, pp. 222,

---

[3]     Cummins had Hill investigate the activity toward another employee. Hill learned Howard had "talked over" Tonkin during a conference call; coaching was recommended for Howard regarding this. (DE 38-8, ¶ 10; DE 38-8 p. 72.)

226.) Plaintiff scheduled a meeting with Hill and Howard for December 2020; however, Plaintiff went out on leave, and the meeting did not take place. (DE 38-2, p. 230.) Howard's role changed in April 2021 "for business reasons unrelated to [Plaintiff], and [Plaintiff] and the rest of Howard's team were assigned a new manager." (DE 38-8, ¶ 12.)

## DISCUSSION

On January 3, 2023, Plaintiff filed an objection to the Report. (DE 50.) However, to be actionable, objections to a report and recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985)). "A general objection to the entirety of the magistrate judge's report is tantamount to a failure to object." Tyler v. Wates, 84 F. App'x 289, 290 (4th Cir. 2003). "Likewise, a mere restatement of the arguments raised in the summary judgment filings does not constitute an 'objection' for the purposes of district court review." Nichols v. Colvin, 100 F. Supp. 3d 487 (E.D. Va. 2015). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Upon review, the Court finds that Plaintiff has raised the following specific objection to the Report: 1) "the Report and Recommendation improperly weighs the evidence rather than acknowledge the evidence as evidence that should be presented to a jury[,]" and 2) "adverse

employment action is not limited to termination or suspension." (DE 50, pp. 2-3, 9.)  As to Plaintiff's claim that the Report improperly weighed the evidence, Plaintiff contends "[w]hether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact[,]'" citing Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994). (DE 50, p. 5.)  To that end, Plaintiff identifies seven facts that create a factual dispute to survive summary judgment.

> (1) Plaintiff was asked to come to work early to train, an altering of her work ho[urs.]  (2) Plaintiff was given an annual evaluation in 2019, that showed her as "approaching expectations" which would overall affect her performance rating and the percentage of merit increase. (3) Plaintiff's supervisor Howard, badgered Plaintiff about working off the clock or taking lunch at the end of the day or asked other employees if they had problems working with Plaintiff, all in an effort to discipline Plaintiff by selectively enforcing the rules for Plaintiff alone.  (4) Plaintiff's white co workers on her team Cynthia Butcher and Brett Tonkin have advanced within the company, while Plaintiff remains in the same job title.  (5) Plaintiff provided evidence of a pattern and practice of discrimination in that Magon Tisdale, a black female employee was working elevated tasks without title or pay and was not considered for promotion.  (6) Plaintiff provided evidence of racial comments to include where she was referenced as "hey you" instead of her name. Plaintiff was also warned of being referenced as "an angry black woman". Plaintiff was also subjected to what Defendant references in its Motion as "stray remarks" ("I like my coffee black like people", "I can't say black jokes" and "Ohio is full of white people, so I wouldn't know why he would be there, considering the fact that he is black", "It's hard to tell you all apart because all you black people look alike")[.]  (7) Plaintiff provided evidence of the Defendant's record of investigation that showed upper management's feelings toward Plaintiff and her complaints being influenced by "Black Lives Matter". Defendant's record of investigation shows Plaintiff as having a reputation for getting someone fired, as someone who had similar concerns with other managers, as someone not open to being flexible and giving pushback.  In addition, Defendant's record of investigation shows Plaintiff's supervisor's response to Plaintiff's complaint about her was " I had a feeling that she would with all that was going on – with George Floyd and courageous conversations I had a feeling that she would try for a 3rd time to go another try."  Nothing was done to Howard as a result of this investigation or her comments.

(DE 50, pp. 4-5.)  Plaintiff asserts, "[t]his evidence alone, as referenced more specifically in Plaintiff's Response in Opposition to Summary Judgment, demonstrates the existence of evidence

that creates a question of fact as to whether or not Plaintiff was racially discriminated and retaliated against for prior complaints." (Id.) This Court disagrees.

The Fourth Circuit in EEOC v. Sunbelt Rentals, Inc. identified the proper standard of review on summary judgment for Title VII claims. See EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). The Sunbelt Rentals Court held, "[t]he task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate' thereby creating an abusive atmosphere." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 316 (4th Cir. 2008) (citation omitted). "The 'severe or pervasive' element of a hostile work environment claim 'has both subjective and objective components.' First, the plaintiff must show that he 'subjectively perceive[d] the environment to be abusive.' Next, the plaintiff must demonstrate that the conduct was such that 'a reasonable person in the plaintiff's position' would have found the environment objectively hostile or abusive." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008) (internal citations omitted).

"[W]hen determining whether the harassing conduct was objectively 'severe or pervasive,' we must look 'at all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" EEOC v. Sunbelt Rentals, Inc., 521 F.3d at 315 (internal citations omitted) (Noting that "'rude treatment by [coworkers],' 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII." (internal citations omitted). "Title VII does not establish a 'general civility code for the American workplace,' . . .

13

[rather], in order to be actionable, the harassing 'conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment.'" Id. (citation omitted),

With these principles in mind, the Report accepts Plaintiff's factual allegations in the light most favorable to her.  Nevertheless, Plaintiff's allegations either do not rise to the level of extreme conduct amounting to a change in the terms and conditions of her employment, or Defendant reconsidered its position to Plaintiff's benefit upon Plaintiff's request or disagreement.  For instance, Plaintiff claims that she was asked to come to work early to train, which altered her work hours.  However, the Report indicates, and the objection does not dispute, that,

> Follow-up email discussions indicate Plaintiff requested that she not be given this additional role as she focused on other areas identified in her evaluation.  Id. at 1-3.  Plaintiff indicated in her deposition that, after she pushed back on doing this additional role, she did not end up having to do that work.

(DE 38-2, p. 183.)  Moreover, regarding alleged "attempted" discipline for work off the clock, the Report notes that Plaintiff testified, "once Howard listened to her explanation, Howard responded and indicated she would edit Plaintiff's time appropriately." (DE 38-2, pp. 19-20.)  Furthermore, regarding Plaintiff's alleged racial remarks, which are noted in note 2 supra, it is unquestioned that these comments pollute the work environment as they are *offensive* and show an utter disregard for cultural and racial sensitivity.  However, they are neither severe nor pervasive because they are isolated comments, and they are not physically threatening or humiliating.  The Report comprehensively and ably addresses this issue and summarizes one of Plaintiff's claims by saying:

> In making this recommendation, the court is mindful that the term 'angry Black woman' may at times connote racial hostility.  See McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 413 (4th Cir. 2022) (Motz, J., concurring) (concurring in affirmance of the grant of summary judgment but noting being known as an 'angry Black woman' was a 'harmful and well-rooted racial stereotype'). Nonetheless, in considering the evidence as a whole in this matter, Howard's one conversation with Plaintiff in which she counseled her to take her time in responding to things so she did not come across as a 'strong, black, angry, disgruntled woman,' Pl. Dep. 119, does not rise to the level of establishing a

14

> sufficiently severe or pervasive hostile environment so as to survive summary judgment.

(DE 49, p. 28.) These instances are not disputed facts, and they do not depict "harassment that was 'persistent, demeaning, unrelenting, and widespread.'" EEOC v. Sunbelt Rentals, Inc., 521 F.3d at 316. Furthermore, Plaintiff has not shown conduct similar to the racial or retaliatory allegations here where courts have previously deemed it to be actionable. Therefore, Plaintiff's objection is overruled.

Turning next to the Report's recommendation that "Plaintiff has not shown she was subjected to an adverse employment action[]" (DE 49, p. 31), Plaintiff objects, arguing that "adverse employment action is not limited to termination or suspension[.]" (DE 50, pp. 2-3, 9). While the Court agrees with this general statement, nevertheless, this objection and the Court's affirmation overlooks the legal basis for the recommendation. As a threshold matter, under Title VII, an adverse employment action is explicitly limited to those actions that affect employment or alter the conditions of the workplace. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006). "In other words, an alleged discriminatory act must 'adversely affect[ ] the terms, conditions, or benefits of the plaintiff's employment.'" Flowers v. Int'l Longshoremen's Ass'n Loc. 1422, No. 2:19-CV-00254-JD, 2021 WL 3400637, at *2 (D.S.C. Aug. 4, 2021) (citing Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007)). "Typical examples of adverse employment actions include 'discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, [and] reduced opportunities for promotion.'" Cole v. Wake Cty. Bd. of Educ., 494 F. Supp. 3d 338, 345 (E.D.N.C. 2020), aff'd, 834 F. App'x 820 (4th Cir. 2021), cert. denied sub nom (citation omitted).

Here, Plaintiff's objection is based on, among other things, her "supervisor's discipline attempts and poor evaluation marks and increased [workload] all directly affect Plaintiff's work

15

performance." (DE 50, p. 9.) However, again the Report comprehensively addresses this issue, stating, "Plaintiff has not set out evidence to show she was assigned significantly different responsibilities, just that she was cross-trained to assist in other duties. Tonkin, too, was cross-trained and believed he had more work than Plaintiff." (DE 49, p. 30.) Further, Plaintiff has not met her burden that "any reassignment must be shown to have had a 'detrimental effect' on Plaintiff. See Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). Finally, Plaintiff's claim that she faced "ongoing attempts to make [her] appear to be insubordinate and a 'trouble maker[,]'" which "kept her from receiving the highest possible marks on her evaluations and 'clearly affected her ability to be promoted within the company[,]'" lacks evidentiary support because she does not cite to any admissible evidence to support this argument. (DE 40, p. 27.) Therefore, this objection is overruled.

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report (DE 49) and incorporates it by reference.

It is, therefore, **ORDERED** that Defendant's Motion for Summary Judgment (DE 38) is granted, and this case is dismissed.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
March 29, 2023

## NOTICE OF RIGHT TO APPEAL

Plaintiff is hereby notified that she has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.